BC

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

**1:26-cv-08439**
**Judge Edmond E. Chang**
**Magistrate Judge M. David Weisman**
**Random/Cat. 2**

**LISA BRIDGFORD,**
Plaintiff,

Case No. ____________

v.

JURY TRIAL DEMANDED

**VILLAGE OF WORTH, a municipal corporation; OFFICER MOHAMMAD SAID, Badge No. 220, in his individual capacity; SERGEANT DANIEL CICHOCKI, Badge No. 52, in his individual capacity; OFFICER CHRISTIAN FERCHAU, Badge No. 208, in his individual capacity; CHIEF OF POLICE TIMOTHY DENTON, in his individual capacity; and VILLAGE PRESIDENT MARY WERNER, in her individual capacity,**
Defendants.

RECEIVED
7/16/2026
MPV
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**COMPLAINT FOR VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983**

**INTRODUCTION**

Plaintiff Lisa Bridgford, proceeding pro se, brings this action under 42 U.S.C. § 1983 against the Village of Worth, Officer Mohammad Said (Badge No. 220), Sergeant Daniel Cichocki (Badge No. 52), Officer Christian Ferchau (Badge No. 208), Chief of Police Timothy Denton, and Village President Mary Werner for violations of her rights under the Fourth and Fourteenth Amendments to the United States Constitution. On February 21, 2025, police officers of the Village of Worth, without a warrant, forcibly breached the back door of Ms. Bridgford's home. In the minutes before the breach, the supervising sergeant on scene personally tested the back door handle, confirmed it was unlocked, looked through the door's window into the home,

and stated aloud — captured on Officer Said's body-worn camera — that the occupants were "just yelling, nothing physical right now," and, during the breach itself, that "We don't have to come in, just come outside." Officer Said nonetheless kicked the door twice with full force, then drove his body weight, his forearms, his ballistic shield, and his body into it again and again — approximately seven impacts in all — breaking the door frame and locking kick plate and repeatedly driving the door into Ms. Bridgford, who was standing directly behind it, while Officer Ferchau pressed his own hands and forearms against Said to add power. She was not a suspect. She was not accused of anything. She cried out in pain — a cry recorded in Officer Said's own written report — and the residents are heard on the body camera footage saying, "You're trying to hurt us." When she told the sergeant on scene that she wanted to press charges, he deflected her. When the Village's Chief of Police and its Village President later confirmed, in a recorded meeting, that they had personally watched the body camera video of Ms. Bridgford being struck, screaming, and crying, they told her it was "100% legal." This lawsuit follows.

## I. JURISDICTION AND VENUE

1. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) because this action arises under the Constitution and laws of the United States, specifically 42 U.S.C. § 1983.

2. Venue is proper in the Eastern Division of the Northern District of Illinois under 28 U.S.C. § 1391(b) because all events giving rise to this action occurred in Worth, Cook County, Illinois, which lies within this Division.

## II. PARTIES

3. Plaintiff Lisa Bridgford ("Bridgford") is a resident of Worth, Cook County, Illinois. At all relevant times, Bridgford was a full-time resident of the home at 10916 South Normandy Avenue, Worth, Illinois 60482. She receives her mail at that address and it is the address on her driver's license. It is her home, and she was inside it on February 21, 2025.

4. Defendant Village of Worth ("the Village") is a municipal corporation organized under the laws of the State of Illinois, located in Cook County. The Village operates the Worth Police Department. At all relevant times the Village acted under color of state law.

5. Defendant Officer Mohammad Said ("Said"), Badge No. 220, was at all relevant times a sworn law enforcement officer employed by the Worth Police Department, acting under color of state law and within the scope of his employment. He is sued in his individual capacity.

6. Defendant Sergeant Daniel Cichocki ("Cichocki"), Badge No. 52, was at all relevant times a sworn law enforcement supervisor employed by the Worth Police Department, acting under color of state law and within the scope of his employment. He was the supervising officer on scene on February 21, 2025. He is sued in his individual capacity.

7. Defendant Officer Christian Ferchau ("Ferchau"), Badge No. 208, was at all relevant times a sworn law enforcement officer employed by the Worth Police Department, acting under color of state law and within the scope of his employment. He is sued in his individual capacity.

8. Defendant Chief of Police Timothy Denton ("Denton") is the Chief of Police of theWorth Police Department and a final policymaker for the Village of Worth on matters of law

enforcement conduct and discipline. At all relevant times he acted under color of state law. He is sued in his individual capacity.

9. Defendant Mary Werner ("Werner") is the Village President of the Village of Worth —the municipality's chief executive and a final policymaker for the Village. At all relevant times she acted under color of state law. She is sued in her individual capacity.

## III. FACTUAL ALLEGATIONS

### A. The February 21, 2025 Call: Verbal Only, No Weapons, No Intoxication

10. On February 21, 2025, at approximately 17:36 hours, Cook County dispatch received a call regarding 10916 South Normandy Avenue, Worth, Illinois. The call was classified as incident type L7350, "Domestic Trouble." The Worth Police Department CAD log for Incident No. WO25-00002532 reflects the following dispatcher entries: at 17:36:26, "MALE FIGHTING HIS FATHER"; at 17:36:40, "VERBAL ONLY RIGHT NOW"; and at 17:37:46, "NO WEAP/INTOX."

11. From before the first officer arrived, the responding officers were therefore informed by dispatch that the incident was a verbal argument between a man and his father, that it was verbal only, and that no weapons and no intoxication were reported.

12. The CAD log reflects that the following officers were dispatched and present on-scene: Officer Ferchau (Unit WO/WO1608, Badge No. 208), Officer Barnes (Unit WO/WO1619, Badge No. 219), Officer Said (Unit WO/WO1620, Badge No. 220), and Sergeant Cichocki (Unit WO/WO1652, Badge No. 52).

13. Upon arrival, Officer Ferchau spoke with the complainant, Eden Engwall. Engwall was on site when police arrived. She had placed the 911 call after exiting the residence, was outside the home and safe, and left the scene before the breach of the door. Before leaving, Engwall had taunted one of the residents, stating in substance that she was going to call the police to get him in trouble.

14. The two people inside the home whose argument prompted the call were Stephen Ziel and his father, David Ziel, the owner of the residence. Bridgford was also inside the home. No one inside the home called the police, and no one inside the home requested police assistance.

**B. Sergeant Cichocki Personally Investigates, Sees a Verbal Argument and Nothing More, and Confirms the Door Is Unlocked**

15. Sergeant Cichocki's own body-worn camera footage, a copy of which is in Plaintiff’s possession, records his movements at the scene.

16. Cichocki first looked through the front window of the residence, through which the room where Stephen Ziel and David Ziel were arguing was visible.

17. Cichocki then entered the private, enclosed rear area of the property through the privacy gate at the front of the residence and walked through the curtilage to the back door of the home. He did not have a warrant, and no occupant of the home invited him onto the property or consented to his presence there.

18. At the back door, Cichocki physically took hold of the door handle and tested it. The door was unlocked. Cichocki acknowledged aloud that the door was unlocked.

19. Rather than entering — as an officer confronting a genuine emergency would — Cichocki chose to wait. He radioed for additional officers, stating in substance: "It's unlocked. Can you guys come to the back of the house? I don't know how much shit's in there. I don't wanna go in. I'll just wait for you guys." He then stood at the back door waiting for backup.

20. The back door of the residence contained a window measuring approximately 30 inches by 24 inches, with a clear, unobstructed line of sight from the back door into the interior of the home to the area where Stephen Ziel and David Ziel were arguing. From where Cichocki stood at the back door, the occupants were visible and audible.

21. Approximately ten minutes after the initial dispatch, Cichocki — having personally observed the interior of the home through the front window and the back door window — was able to report, and did report, that the occupants were only yelling and that nothing physical was occurring.

22. Officer Said's body-worn camera footage, a copy of which is in Plaintiff's possession, captures Sergeant Cichocki, visibly identified on the footage, stating verbatim in the moments immediately before Said kicked the door: "It's unlocked, the door's unlocked. They're just yelling nothing physical right now. Better go with that first."

23. Those words — spoken by the supervising officer on scene, seconds before the forced entry, and recorded on the entry officer's own body camera — establish the officers' contemporaneous, actual assessment of the scene at the moment of entry: the door was unlocked, the occupants were only yelling, and nothing physical was occurring.

**C. The Warrantless Forced Entry and the Injury to Bridgford**

24. According to the incident report authored by Officer Said (Worth Police Department Incident Report No. 2025002532), Sergeant Cichocki advised that the back door was open and requested a shield operator to go first in the stack of officers. Cichocki thereby directed and organized the breach.

25. Before the breach, Said and Ferchau stood at the back door of the residence with e weapons drawn. In order to force the door, they holstered their weapons.

26. Said's own incident report records that when Said first opened the unlocked back door, a female — Bridgford — quickly descended the interior staircase and shut and locked the door against him from the inside. Said therefore knew, from his own firsthand observation seconds earlier, that Bridgford was standing immediately behind the door.

27. Said's own incident report records that Stephen Ziel stated through the door that he would not open it because Said "did not have a warrant." No warrant existed. Said's report contains no assertion that a warrant was ever sought or obtained.

28. Said's own incident report records that a female voice from inside the residence stated, “We are all fine."

29. David Ziel — the homeowner and the father whose welfare was the only conceivable justification for entry — was standing at the top of the interior back landing with the kitchen door open, visible through the back door window, waving at the officers and yelling at them to stop. He was visibly alive, upright, and unharmed.

30. Notwithstanding all of the foregoing — no warrant, dispatch confirmation of "VERBAL ONLY" and "NO WEAP/INTOX," the supervising sergeant's own recorded statement that the occupants were "just yelling nothing physical right now," an occupant's statement that "We are all fine," the visible and unharmed presence of the very person whose welfare was at issue, and Said's own knowledge that Bridgford was standing directly behind the door — Said and Ferchau set about forcing the door. Said's own words in his incident report are: "I put down my ballistic shield and kicked the door breaking the door frame and locking kick plate."

31. Said's body-worn camera footage, a copy of which is in Plaintiff's possession, records the breach in detail. Said delivered no fewer than two full-force kicks to the door — one a "mule kick" and one a "front kick." When the kicks did not gain entry, Said applied continuous force to the door using his full body weight and his forearms, punctuated by lifting off the door and ramming it with his ballistic shield and with his body. Officer Ferchau positioned himself behind Said and used his own hands and forearms to provide Said additional leverage and power against the door. In total, the footage records two kicks and approximately five additional body and shield impacts driven into the door.

32. Bridgford was on the other side of that door the entire time. Each impact drove the door into her. She was struck by the door approximately seven times, including being struck in the face.

33. During the breach, the residents are heard on Said's body camera footage saying, verbatim: "You're trying to hurt us." The force did not stop.

34. During the breach, Sergeant Cichocki stated on body camera, verbatim: "We don't have to come in, just come outside." The supervising officer on scene thus acknowledged, in the very moments the force was being applied, that entry into the home was not necessary.

35. Said's own incident report records that upon the door being forced, the female inside shouted "OW."

36. David Ziel witnessed the impact. In his written personal testimony dated February 4, 2026, he states: "He proceeded to knock the door in with extreme force, and I noticed the door hit Lisa in the face hard, and I was concerned that she would get seriously injured."

37. Bridgford was not a suspect. She was not wanted for anything. She was not accused of any offense. She posed no threat to anyone. She was a resident standing inside her own home behind her own back door.

38. The breach destroyed the door frame and the locking kick plate. The back door remains off its frame and unusable to this day.

39. No arrests were made. No criminal complaint issued from the events of February 21, 2025. The incident report disposition codes are D10 and D16.

**D. The Immediate Aftermath: Bridgford Seeks Accountability On Scene and Is Deflected**

40. After the entry, Bridgford approached Officer Said and requested his name and badge number, which he provided. Said documented this interaction in his own report and stated it was captured on his body-worn camera.

41. The Worth Police Department's own internal investigation report for Complaint Register No. 2025014221 states: "Lisa exited the residence and told Sergeant Cichocki she wanted

to press charges against Officer Said. Sergeant Cichocki explained to her that Worth Police Officers' actions were based off of exigent circumstances." The supervising officer who had directed the entry thus deflected, on the spot, the injured resident's request to press charges against the officer who injured her.

42. Cichocki's assertion of "exigent circumstances" to Bridgford is irreconcilable with his own recorded words moments before the entry — "They're just yelling nothing physical right now" — and with his own conduct of waiting at the unlocked door for backup rather than entering.

43. After the forced entry, Sergeant Cichocki's own body-worn camera captured him stating verbatim: "This is so fucking stupid all this over a verbal domestic, they don't wanna answer the door."

**E. Bridgford's Injuries**

44. As a direct result of being struck by the door, Bridgford suffered physical impact and pain to her face and head.

45. Since February 21, 2025, Bridgford has suffered recurring headaches occurring approximately six to eight times per month, of varying degrees of severity — sometimes mild, sometimes debilitating. She did not suffer from headaches before February 21, 2025.

46. Bridgford has suffered, and continues to suffer, emotional distress, fear, and a lost sense of security in her own home. She was repeatedly struck by the door of her own house by an officer who knew she was standing behind it, after the supervising officer had already announced that nothing physical was occurring inside.

47. Because the breach left the back door off its frame and unable to lock, Bridgford has lived since February 21, 2025 with the continuing distress of an unsecured back door. The

residents' distress was so severe that they installed a drawbridge-style wood beam — of the kind used to bar doors in old castles — in order to secure the back door. Their fear was so severe that they installed the same mechanism on the front door as well, even though the front door's locks were fully functional.

**F. The Village Ratifies the Conduct at the Policymaking Level**

48. In November 2025, a formal citizen complaint was filed with the Worth Police Department specifically identifying Officer Said and the February 21, 2025 forced entry.

49. The Village opened Complaint Register No. 2025014221. Deputy Chief

Robert Petersen (Badge No. 88) was assigned to investigate. The signed internal investigation form identifies the accused employee not as Officer Said, but as Officer Armando Delgado, I.D. No. 217, for an unrelated September 21, 2024 incident. The Village produced no standalone internal affairs investigation file addressing Officer Said and the February 21, 2025 forced entry — the primary subject of the complaint.

50. Deputy Chief Petersen's investigation report states that he reviewed the body-worn camera footage of Officers Said and Ferchau and Sergeant Cichocki for Case I on the scene and 2025002532 — the February 21, 2025 incident — and concluded: "There are no apparent violations of Worth Police policy emitting from the actions of any other police officer in incidents described by Ziel's complaint." A policymaking-level official of the Village thus personally reviewed the footage of the warrantless entry and of Bridgford being struck, and approved the conduct.

51. The signed investigation form records a disposition of "Policy Failure," defined on the form as: "The investigation revealed that the alleged act(s) did occur, however, the conduct was in accordance with department policy." "Policy Failure" is not among the dispositions authorized by Worth Police Department Policy 1010.6.4, which lists only "Unfounded," "Exonerated," "Not Sustained," and "Sustained."

52. On November 18, 2025, Chief of Police Timothy Denton sent a certified letter stating: "An investigation has been conducted into your report of misconduct by a member of this department. The investigation established that the conduct of the concerned employee was contrary to the Rules and Regulations of this department. You may be assured that this department does not tolerate such conduct and that appropriate disciplinary action has been administered." The letter is irreconcilable with the investigation form issued the same day: the form finds the conduct was within policy; the Chief's certified letter states it was contrary to the Rules and Regulations and that discipline was administered. Moreover, the only officer named in the investigation file, Officer Delgado, had resigned from the Worth Police Department on November 12, 2024 — a year before the complaint was filed — making the administration of "appropriate disciplinary action" impossible on its face.

53. On January 15, 2026, Chief Denton sent an email stating: "The Village of Worth will not be strong armed into giving you a settlement. All of our actions with you have been lawful."

54. On March 16, 2026, Bridgford attended a recorded meeting with Chief Denton andVillage President Mary Werner. A recording of the meeting is in Plaintiff's possession. At that meeting, Bridgford stated: "I'm the one who was assaulted that night. I really wasn't sure I was gonna get involved in this, but then I did. Did you guys watch the police body cam video?" Chief

Denton answered: "Yep." Werner answered: "Yes."

55. Chief Denton then stated: "Everything's 100% legal." Bridgford asked: "So you guys heard me scream behind the door and you heard me crying at the end?" Werner responded: "It's 100% legal so you know."

56. By those answers, the Village's chief law enforcement policymaker and the e executive confirmed that they had personally reviewed the body camera footage showing a non-suspect resident being struck by the door, screaming, and crying — and ratified that conduct, and the warrantless entry that produced it, as "100% legal."

57. The Illinois Law Enforcement Training and Standards Board (ILETSB) has an open, active investigation into the Worth Police Department concerning the excessive force used in this incident and allegations of a cover-up.

58. In a FOIA extension letter dated March 31, 2026 (FOIAWPD202653), the Village acknowledged that over 1.5 hours of body camera recordings responsive to FOIA requests concerning the February 21, 2025 incident exist. Said's own incident report confirms he exported his body camera footage of the incident to Motorola Command Central. The Village has not produced that footage.

59. On January 2, 2026, at approximately 11:30 p.m. — only weeks after the WorthPolice Department was informed that litigation was being sought — Worth Police Officer K. Szwab (Badge No. 210) conducted a traffic stop of a vehicle registered to David Ziel. Bridgford was, at that time, the customary and near-exclusive driver of that vehicle; on the night of the stop, by anomaly, she was not in it. The stated basis for the stop was a non-functional license plate light. Contemporaneous evidence from immediately after the stop shows the light was fully functional,

and dash cam footage of the stop — obtained by Plaintiff through FOIA — likewise shows the light was functional. This stop, together with the conduct described above, contributed to Bridgford's fear of the Worth Police Department and her lost sense of security.

**G. Summary of the Municipal Custom, Policy, and Ratification**

60. The facts alleged above establish that the Village of Worth, through its final policymakers, has ratified the warrantless forced entry of February 21, 2025 and the force used against Bridgford, and maintains customs and practices including: (a) approving warrantless forced entries of homes in the absence of legally sufficient exigent circumstances; (b) deflecting, at the supervisory level and on scene, citizens' attempts to lodge complaints and press charges against officers; (c) failing to conduct any standalone internal investigation of a forced entry specifically identified in a formal citizen complaint; (d) recording dispositions not authorized by the Department's own Policy 1010.6.4; (e) issuing official written communications to complainants that contradict the Department's own investigation findings; (f) publicly declaring conduct "100% legal" after policymakers personally reviewed footage of that conduct; and (g) withholding body camera footage acknowledged to exist.

## IV. CAUSES OF ACTION

### COUNT I — FOURTH AMENDMENT: WARRANTLESS FORCIBLE INTRUSION INTO THE HOME

42 U.S.C. § 1983 (Against Defendants Said, Cichocki, and Ferchau)

61. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

62. The Fourth Amendment, applicable to state actors through the Fourteenth Amendment, guarantees the right of the people to be secure in their houses against unreasonable searches and seizures. "[T]he Fourth Amendment has drawn a firm line at the entrance to the house," and warrantless searches and seizures inside a home are presumptively unreasonable. Payton v. New York, 445 U.S. 573, 586, 590 (1980).

63. Bridgford was a full-time resident of the home at 10916 South Normandy Avenue with a reasonable expectation of privacy in it.

64. On February 21, 2025, Defendants, acting without a warrant and without consent, forcibly breached the back door of Bridgford's home — repeatedly driving the door inward into the interior of the home and into Bridgford's body, and destroying the door frame and locking kick plate. A forcible physical breach of the door of a home is an intrusion into the home itself; the Fourth Amendment's firm line at the entrance to the house is crossed by any physical invasion of the structure, however slight. The government bears the burden of proving an exception to the warrant requirement. Kentucky v. King, 563 U.S. 452, 459–60 (2011).

65. No exigency existed, and the officers' own records and recordings prove they knew it: (a) dispatch logged "VERBAL ONLY RIGHT NOW" and "NO WEAP/INTOX" before any officer arrived; (b) the supervising sergeant personally looked into the home through the front window and through the back door window, which afforded a clear line of sight to the argument; (c) the supervising sergeant tested the door, found it unlocked, and elected to stand and wait for backup rather than enter — conduct incompatible with a belief that anyone inside needed immediate aid; (d) seconds before the entry, the supervising sergeant stated on camera, "They're

just yelling nothing physical right now"; (e) a voice from inside stated, "We are all fine"; (f) David Ziel, the sole person whose welfare was in question, was visible through the back door window, upright, waving, and unharmed; and (g) during the breach itself, the supervising sergeant stated on camera, "We don't have to come in, just come outside" — an acknowledgment in real time that entry was unnecessary. The emergency-aid exception requires an objectively reasonable basis to believe a person inside needs immediate aid, Michigan v. Fisher, 558 U.S. 45, 47 (2009); no objectively reasonable officer could have held that belief on these facts.

66. The right to be free from warrantless entry into the home absent consent or exigency was clearly established long before February 21, 2025. Payton, 445 U.S. at 590.

67. Said executed the breach. Cichocki, the supervising officer, directed the breach, requested the shield operator, and organized the stack. Ferchau physically participated in the breach, applying his hands and forearms to give Said additional power against the door. Each defendant personally participated in, directed, or facilitated the warrantless forcible intrusion.

68. As a direct and proximate result, Bridgford suffered violation of her constitutional rights, physical injury, pain, and emotional distress.

**COUNT II — FOURTH AMENDMENT: WARRANTLESS SEARCH OF THE CURTILAGE AND PHYSICAL INTRUSION ON THE HOME**

42 U.S.C. § 1983 (Against Defendant Cichocki)

69. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

70. The curtilage of a home — the enclosed area immediately surrounding it — is part of the home itself for Fourth Amendment purposes, and a physical intrusion into the curtilage to gather information is a search. Florida v. Jardines, 569 U.S. 1, 6–11 (2013); Collins v. Virginia, 138 S. Ct. 1663, 1670 (2018).

71. Cichocki, without a warrant and without consent, entered through the privacy gate, traversed the enclosed rear area of the property, approached the back door, physically manipulated the door handle of the home, and looked through the door's window into the interior — all to gather information. Each of those acts exceeded any implied license and constituted a warrantless search of the home and its curtilage.

72. This right, too, was clearly established before February 21, 2025. Jardines, 569 U.S. at 11.

73. As a direct and proximate result, Bridgford suffered violation of her constitutional rights and emotional distress.

**COUNT III — FOURTH AMENDMENT: EXCESSIVE FORCE**

42 U.S.C. § 1983 (Against Defendants Said and Ferchau)

74. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

75. The Fourth Amendment prohibits objectively unreasonable force. Graham v. Connor, 490 U.S. 386, 395–97 (1989). Reasonableness is judged in light of the severity of any crime at issue, whether the person poses an immediate threat, and whether the person is resisting or fleeing.

76. Said knew Bridgford was standing directly behind the door: his own report records that she had just descended the stairs and shut and locked the door against him. Knowing a non-suspect resident stood immediately behind the door, and having just heard his supervisor state that the occupants were "just yelling nothing physical right now," Said delivered two full-force kicks to the door, then applied continuous force with his full body weight and forearms, punctuated by ramming the door with his ballistic shield and his body — approximately seven impacts in all, with force sufficient to break the door frame and the locking kick plate — each impact intentionally driving the door into the space he knew Bridgford occupied. Ferchau, positioned behind Said, applied his own hands and forearms to give Said additional leverage and power for that force.

77. The door struck Bridgford approximately seven times, including in the face. She shouted "OW" — recorded in Said's own report. The residents are heard on the body camera footage saying, "You're trying to hurt us." The force continued. David Ziel witnessed the door "hit Lisa in the face hard."

78. Bridgford was suspected of no crime, posed no threat, and was not resisting or evading arrest — there was no arrest to resist. Any intentional application of force against her was, on these facts, objectively unreasonable — and it became more unreasonable with each successive impact after her outcry and the residents' audible statement that they were being hurt. The right of a non-threatening, non-resisting person to be free from significant force was clearly established before February 21, 2025.

79. As a direct and proximate result, Bridgford suffered physical injury to her face and head, pain, recurring headaches occurring six to eight times per month that she never previously experienced, and emotional distress.

## COUNT IV — FAILURE TO INTERVENE

42 U.S.C. § 1983 (Against Defendants Cichocki and Ferchau)

80. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

81. An officer who is present, knows a constitutional violation is being committed, and has a realistic opportunity to prevent it, is liable for failing to intervene. Yang v. Hardin, 37 F.3d 282, 285 (7th Cir. 1994).

82. Cichocki and Ferchau were present at the back door throughout the breach. Both knew there was no warrant. Cichocki had personally verified there was no emergency, announced as much on camera before the breach, and stated during the breach itself that "We don't have to come in, just come outside." The breach was not a single instant but a sustained series of approximately seven impacts against a door with a person audibly being hurt behind it; both defendants had a realistic opportunity to stop it — Cichocki by a single word of command as the supervisor who had organized it — and neither did.

83. As a direct and proximate result, Bridgford suffered violation of her constitutional rights, physical injury, and emotional distress.

## COUNT V — RATIFICATION, CONDONATION, AND COVER-UP BY SUPERVISORY

OFFICIALS — 42 U.S.C. § 1983 (Against Defendants Denton and Werner)

84. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

85. A supervisory official is personally liable under § 1983 where the official knows about unconstitutional conduct and facilitates it, approves it, condones it, or turns a blind eye to it. Chavez v. Illinois State Police, 251 F.3d 612, 651 (7th Cir. 2001); Gentry v. Duckworth, 65 F.3d 555, 561 (7th Cir. 1995).

86. Defendant Denton issued a certified letter on November 18, 2025 stating that the concerned employee's conduct was contrary to the Rules and Regulations and that discipline had been administered — a statement irreconcilable with the investigation form issued the same day and impossible on its face as to the only officer named in the file, who had resigned a year earlier. Denton thereafter declared in writing on January 15, 2026 that "All of our actions with you have been lawful," and confirmed on a recording on March 16, 2026 — in a meeting Bridgford personally attended — that he had personally watched the body camera footage and that "Everything's 100% legal." Denton thereby condoned and ratified the unconstitutional conduct with full knowledge of it, including full knowledge that the footage he watched showed a non-suspect resident being struck by the door, screaming, and crying, and obstructed the citizen complaint process through contradictory official communications.

87. Defendant Werner, the Village's chief executive, confirmed on Thursday the same March 16, 2026 recording that she had personally watched the body camera footage, and — when asked by Bridgford directly whether she had heard Bridgford scream behind the door and cry — responded, "It's 100% legal so you know." Werner thereby condoned and ratified the unconstitutional conduct with full knowledge of it.

88. The knowing approval, condonation, and ratification of the warrantless forced entry and of the force that injured Bridgford, by the Department's chief and the Village's chief executive,

caused continuing injury to Bridgford, prolonged and compounded the deprivation of her rights, denied her citizen complaint any legitimate process, and communicated to the officers of the Worth Police Department that the conduct was authorized.

89. As a direct and proximate result, Bridgford suffered violation of her constitutional rights and emotional distress.

**COUNT VI — MUNICIPAL LIABILITY**

42 U.S.C. § 1983; Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978) (Against Defendant Village of Worth)

90. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

91. A municipality is liable under § 1983 where a constitutional injury is inflicted pursuant to municipal policy or custom, or where a final policymaker ratifies a subordinate's unconstitutional conduct and the basis for it. Monell, 436 U.S. at 694; City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988).

92. Chief of Police Timothy Denton is a final policymaker for the Village of Worth on matters of law enforcement conduct and discipline. Mary Werner is the Village President of Worth — the municipality's chief executive and a final policymaker for the Village.

93. With full knowledge of the facts — each having confirmed on a recording that they personally watched the body camera footage of the warrantless breach and of Bridgford being struck, screaming, and crying — Chief Denton declared the conduct "100% legal," and Village

President Werner declared, "It's 100% legal so you know." That is ratification of both the conduct and its purported basis by two final policymakers of the Village, including its chief executive.

94. The ratification is corroborated by the Village's entire course of conduct: DeputyChief Petersen reviewed the same footage and found no policy violation; the internal investigation of the complaint identifying Said was redirected onto a long-departed officer; the disposition entered does not exist under the Village's own Policy 1010.6.4; the Chief's certified letter contradicts the Village's own investigation form issued the same day; the Chief thereafter declared in writing that "All of our actions with you have been lawful"; and the Village continues to withhold more than 1.5 hours of body camera footage it acknowledges exists.

95. The Village's policy, custom, and ratification were the moving force behind the violations of Bridgford's Fourth Amendment rights alleged in Counts I through IV.

96. As a direct and proximate result, Bridgford suffered violation of her constitutional rights, physical injury, and emotional distress.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Lisa Bridgford respectfully requests that this Court enter judgment in her favor and against Defendants as follows:

a. Compensatory damages against all Defendants, jointly and severally, for physical injury, pain and suffering, recurring headaches, emotional distress, the cost of repairing or replacing the back door — which remains off its frame and unusable to this day — the expenses incurred to secure the residence, and all other harm proximately caused by Defendants' conduct;

b. Punitive damages against Defendants Said, Cichocki, Ferchau, Denton, and Werner in their individual capacities for their willful, wanton, and reckless disregard of Plaintiff's clearly established constitutional rights;

c. A declaration that the warrantless entry of Plaintiff's home on February 21, 2025violated the Fourth and Fourteenth Amendments;

d. An order requiring Defendants to preserve and produce all body-worn camera footage, dash camera footage, radio traffic, and internal affairs records relating to the February 21, 2025 incident and any investigation of it;

e. Costs of suit, and attorney's fees under 42 U.S.C. § 1988 should counsel be retained;

f. Such other and further relief as this Court deems just and proper.

**VI. JURY DEMAND**

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

s/ Lisa Bridgford
Lisa Bridgford, Pro Se
10916 South Normandy Avenue
Worth, Illinois 60482
Telephone: (630) 272-9828
Email: lisabridgford@gmail.com
Dated: July 14, 2026